**UNITED STATES DIS\TRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| ALEXANDER COOKE, | : | CIVIL ACTION NO.: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FAIRFIELD BUSH & CO., | : | December 4, 2017 |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

**COMPLAINT**

## I.    PRELIMINARY STATEMENT

1.    Alex Cooke ("Plaintiff") files the instant complaint against Fairfield Bush & Co. ("Defendant"), and alleges as follows.

2.    This is an action arising out of illegal actions by senior executive Charles Krause at Defendant Fairfield Bush & Co.  Plaintiff is employed by Defendant and his title is Director and Portfolio Manager, however he does not have any decision-making authority because Defendant is wholly owned by sole shareholder and President, Charles Krause ("Krause").  During his employment, Plaintiff repeatedly communicated to Krause and other Directors and senior employees regarding irregularities with Defendant's finances, including the manner in which fees were deducted from client accounts, which reflected a lack of compliance with federal and state securities laws.  As a result of Plaintiff's reporting these issues to Krause and other senior employees, Plaintiff was retaliated against.  He was isolated from other employees, told not to come to work by Krause, told not to access or use company email or any company files, shut out of meetings he would normally be included on, and removed from accessing certain company databases that he previously had access to.

1

## II.    PARTIES

3.    Defendant is a Connecticut corporation with headquarters at 265 Church Street, Suite 503, New Haven, CT 06510.  Defendant is authorized to conduct business in the State of Connecticut and is registered as a domestic corporation.

4.    Plaintiff resides in New Canaan, Connecticut 06840.

## III.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1331 because it presents a federal question under 15 U.S.C. § 78u-6(h) and 29 U.S.C. § 201.  This Court has supplemental jurisdiction over Plaintiff's State Law claims pursuant to 28 U.S.C. § 1367.

6.    Venue is proper as to the parties herein in Connecticut.  Plaintiff was employed by Defendant in New Haven, Connecticut and the actions underlying the allegations herein took place in Connecticut.

## IV.    STATEMENT OF FACTS

7.    Plaintiff began working for Defendant in 2005 and his current title is Director and Portfolio Manager.

8.    Defendant was initially named Fairfield Research Corp, but approximately 3.5 years ago Defendant purchased a firm called J. Bush & Co.  After the acquisition, the name of Defendant was changed to Fairfield Bush & Co.

9.    Charles Krause is the sole owner and shareholder of Defendant, and holds the title of President and Managing Director of Fairfield Bush & Co.  Plaintiff assisted with the acquisition of J. Bush & co. and hoped that the business of Defendant would grow.

10.    On information and belief, in early 2015, Krause was struggling with his marriage and was dating women outside his marriage. Plaintiff was aware of this, in part, because he assisted with compliance-related monitoring of email traffic and observed that Krause was using his Defendant-owned business email address for Adult Friend Finder and AshleyMadison.com adult "dating" websites.

11.    Near the end of 2015, Krause began dating his now-girlfriend, Sviatlana Afanasyeva. Around that time, Plaintiff observed that Krause was frequently spending $1,500 per night or more on his company (Defendant) owned credit card (American Express) for hotel reservations at the Baccarat hotel in New York City (despite owning a residence in New Canaan, Connecticut). Plaintiff and other employees were aware of this because they had access to view charges for accounting purposes on the Defendant-owned card that Krause was using.

12.    At or around the same time, multiple employees of Defendant, including Plaintiff, began noticing that Krause was incurring additional excessive charges on the Defendant-owned corporate credit cards, and that Krause was removing large amounts of funds from the Defendant bank accounts. Amy Maser, the employee of Defendant responsible for inputs into the Defendant accounting software, observed that the removal of funds and spending was rapidly becoming extreme and brought it to Plaintiff's attention.

13.    At that time, the Defendant-owned corporate credit cards were continuing to have unusually large balances (*e.g.* $50,000 a month or more) on what clearly appeared to be non-business-related spending. Plaintiff understood that Krause was spending lavishly on his new girlfriend, Sviatlana Afanasyeva.

14.    In April 2016 Krause went to Europe with Sviatlana Afanasyeva and spent over $50,000 in just one week on the Defendant-owned credit card. In addition, in May 2016, Krause went on

3

a trip to Paris with Sviatlana Afanasyeva and skipped his son's, Charles Krause Jr., college graduation, while claiming to his family that he was unable to attend because he was working at the time.  This incident in particular made Plaintiff concerned that Krause's decision-making abilities appeared to be substantially impaired.

15.    In mid-summer 2016 Krause leased a Mercedes Benz sl400 convertible for $1080.00 per month at the Defendant's expense.  He attempted to conceal this expense from Defendant's employees by utilizing a Defendant-owned bank account that was not one typically used for regular business.

16.    In late May of 2016 Krause filed for divorce against his wife, Margaret Krause.

17.    Alan Tackman, Defendant's accountant at that time, worked with Plaintiff to reconcile Defendant's accounting books through June 30, 2016.  Tackman openly acknowledged with Plaintiff that Krause's spending appeared to be creating problems for Defendant and told Plaintiff he intended to have a discussion with Krause about reducing the spending.

18.    Throughout the summer of 2016, additional employees approached Plaintiff with concerns regarding Krause's use of Defendant's funds.  Multiple employees were concerned about how Defendant was going to meet operating expenses when Krause was spending large amounts and continuing to remove funds from Defendant's accounts.

19.    In mid-July 2016 two additional employees, Christopher Getman and Erik Pearson, joined Defendant from Soundview Management.

20.    During the closing period for the third quarter of October 16-21, 2016, Plaintiff became increasingly concerned regarding the rate of spending by Krause and the sustainability of Defendant with dramatically reduced capital to meet expenses.  On October 18, 2016, Plaintiff printed out the Defendant-owned American Express credit card year-to-date data from

Defendant's Quickbooks accounting software and asked Krause to discuss the information. Plaintiff showed Krause that he had spent over $400,000 on the Defendant-owned credit cards through September 21, 2016. Krause responded by asking Plaintiff if it was possible to conceal that information from other employees.

21.     During that same conversation, Plaintiff informed Krause that the vast majority of the expenses on the Defendant American Express and Visa card did not appear to be legitimate business expenses. Plaintiff further emphasized to Krause that such a large amount of personal spending posed a risk regarding possible issues with the IRS, the staff, clients, and/or the SEC if that kind of non-business spending came to light.

22.     By November 2016, it was apparent to Plaintiff that Krause had disregarded Plaintiff's advice to cease the excessive spending of Defendant's funds because Krause continued spending excessively on the Defendant credit cards, which resulted in Defendant struggling to meet operating expenses each month.

23.     On or about December 1, 2016, Plaintiff talked to Krause again about his spending and pleaded with him to stop. Mary Milman, another Director and Vice President of Defendant, also discussed with Krause the problems that his spending was creating for the Defendant.

24.     Also on or about December 1, 2016, Krause had a client, who is an attorney, draft a lease for a house rental in Mamaroneck, New York. The house was for Krause to live in with his girlfriend, Sviatlana Afanasyeva, and her two children. The cost of the house lease was $180,000, plus a $20,000 deposit and various other monthly expenses for one year, all of which was required to be paid up front.

25.     On or about December 5, 2016, Plaintiff, Mary Milman, Jonathan Bush, and the new Managing Director Chris Getman, all met together with Krause in another attempt to ask Krause

to reduce his spending of Defendant funds on personal expenses. Everyone in the meeting begged Krause to allow an audit of the Defendant accounting books and asked Krause to hire an accounting firm called Beers, Hamerman, Cohen & Burger, PC ("Beers Hammerman").

26.     It was soon evident that Krause ignored the pleas of his fellow Directors.  Later that same day, Krause began verbally attacking Plaintiff, claiming that Plaintiff had ruined Krause's relationships with his partners.  Plaintiff reminded Krause that he initially brought up the spending issues with him privately, but that Krause had ignored his advice and continued excessively spending Defendant funds.

27.     At that point, Krause yelled at Plaintiff and asked if Plaintiff wanted to get into the items he purchased.  Plaintiff responded by pointing out that one purchase made on the Defendant American Express card was for approximately $10,000 from a jewelry store. To Plaintiff's shock and amazement, Krause's response was to claim that the jewelry purchase was "an investment for the firm."

28.     The following day Krause asked Plaintiff to meet with him.  During that meeting, Krause showed Plaintiff several bank print outs and told Plaintiff that he was returning some of the money he had taken out.

29.     Based on the documents he was displaying, it was clear to Plaintiff that Krause was taking out loans and, therefore, simply taking on debt to replace the money he had spent. Plaintiff immediately told him as much, stating "those appear to be loans so all you are doing is creating more debt."  Krause told Plaintiff that he wanted Plaintiff to tell Directors Chris Getman and Jonathan Bush that he was putting money back into Defendant's accounts to replace the money he had spent on personal expenses.  Plaintiff refused and informed Krause that he would not help Krause with anything along those lines unless Krause allowed Defendant to

immediately hire the accountants that the Defendant's Directors had previously requested, *i.e.* Beers Hammerman.

30.    Krause informed Plaintiff that he did not want to hire the accountants, Beers Hammerman.  Krause and Plaintiff fought about the situation until eventually Krause relented and told Plaintiff that he would hire them.  In exchange, Plaintiff agreed to tell Chris Getman and Jonathan Bush that Krause was trying to put money back into the Defendant's accounts.

31.    Despite what Krause told Plaintiff, on or about December 14, 2016, Krause removed over $200,000 from Defendant's bank account to pay for his Mamaroneck, New York rental home. At the same time he was renting the home in Mamaroneck, he was still paying for the house he used to share with his wife in New Canaan, Connecticut.

32.    On or about the same date, Amy Maser, a member of Defendant's accounting staff, approached Plaintiff regarding problems she was having reconciling Defendant's accounting records through November 2016.  In particular, Amy Maser told Plaintiff that she was having an issue with $105,000 that had been moved to another Defendant account and then disappeared from that account, noting a branch activity on the statement. Amy Maser asked Plaintiff if he knew the contra account.  Plaintiff informed her that he did not and told her the only person who might was Krause.  Amy Maser then went to went to Krause to discuss. A few minutes later, Amy Maser returned to Plaintiff and informed Plaintiff that Krause has advised her that he intended to take the duties of reconciling Defendant's accounts away from her.  Amy Maser told Plaintiff she was upset and fearful that Krause was going to destroy Defendant and possibly incur liability for Defendant and employees of Defendant.  Amy Maser quit shortly thereafter.

33.    On December 31, 2016, Defendant had a total of $739 in Defendant's bank account. The Defendant was essentially broke.  Even worse, in order to keep the account positive at all,

Krause balance transferred $2,000 from a Wells Fargo credit card that he had just opened into the account.

34.    On January 2, 2017, Defendant hit a new billing period for client accounts.  In order to keep up with his credit card spending and cover the money he had taken out of Defendant's accounts, Krause pushed the other employees of the firm to debit fees from clients before the client accounts were reconciled, *i.e.* before client invoices were issued.  To do this, Krause requested estimated bills, and then essentially had the Defendant debit the clients less than he thought the total invoice would be (to get funds in quickly), and then, once the correct amount of the client fee was determined, the Defendant would debit the remainder.  Krause was and is aware that it is a violation of Rule 206(4)-2 of the Investment Advisors Act of 1940 (the "Custody Rule"), 17 C.F.R. § 275.206(4)-2, and Connecticut Uniform Securities Act Regulation § 36b-31-5b (which requires that "investment adviser sends to each client, not less frequently than once every three months, an itemized statement showing the funds and securities in the custody or possession of the investment adviser at the end of such period, and all debits, credits and transactions in such client's account during such period." (emphasis added)).  Krause is required to provide clients with documentation of all fees deducted and the timing of such deductions.  Krause has repeatedly failed to provide this very basic disclosure to clients. Defendant violates the Custody Rule when it fails to reconcile and debit fees from clients only after the invoice is ready for delivery to the client.  Instead, Defendant's ongoing practice is to create and draft non-final invoice, then debit money from client account based on that invoice – without ever disclosing the draft invoice and debited funds to the clients – and then, at a later date, issue a final, correct invoice to the client and then either debit additional funds from the client or refund funds to the client if the previous invoice was too high.

35.    After Amy Maser quit, Krause immediately hired another woman who he had worked with previously, Penney Detchon, as an administrator.  Penney's role was to assist with accounting and reconciling of Defendant's books.

36.    Plaintiff and the other Directors advised Krause against such a rash hiring.  However, Krause ignored the Directors and it quickly became clear that Krause hired Penney to assist him with his cover up relating to his personal use of Defendant's funds.

37.    In mid-January Plaintiff analyzed the Defendant's financial situation and determined that Defendant would be essentially broke again by March (*i.e.* that Defendant's bank accounts would have a very, very low balance).  Plaintiff relayed his concerns and fears about the sustainability of Defendant amid Krause's excessive spending to Mary Milman and Jonathan Bush in hopes that maybe they could control Krause.

38.    Toward the end of February 2017, Plaintiff was sorting through business emails for cleaning and compliance (Defendant's emails are not private and must be turned over to any authority that requests them, such as the SEC – this is and was a routine part of Plaintiff's job, which Krause was well aware of).   In doing so, Plaintiff discovered emails that Krause had sent to his divorce attorney over his non-private Defendant-owned email account.  Plaintiff immediately observed that, in those emails, Krause was lying about his income - Krause stated that his income was only $48,000, plus $90,000 in annual dividends from Defendant – which is clearly incorrect.  On information and belief, Plaintiff understands that Krause also filed financial affidavits with the Connecticut Superior Court in connection with his divorce action attesting to those fraudulent numbers.  Krause admitted in his emails to his lawyer that it would be an embarrassment for his employees if he had to provide information about the Defendant's

financial status – presumably because Krause was well aware that his constant using of Defendant's funds for personal expenses was unethical and illegal.

39.     On the week of February 27, 2017, Plaintiff notified Jonathan Bush and Chris Getman of his deep concern that Krause was putting the business, clients, and employees at extreme risk. Plaintiff also informed Jonathan Bush and Chris Getman that Defendant was once again essentially broke and likely unable to cover operating expenses – Krause was essentially running Defendant month-to-month and spending client fees immediately once they came in.  Plaintiff also alerted Jonathan Bush and Chris Getman that Krause was attempting to put off financial reporting and conceal records specifically to hide them from his divorce case.

40.     On March 5, 2017, Jonathan Bush and Chris Getman met with Krause in Florida along with Frank Keeler, who is an RIA consultant that Krause had hired, purportedly to assist with managing Defendant's business.  During that meeting, Frank Keeler and Krause told Jonathan Bush and Chris Getman that they were considering firing Plaintiff because of Plaintiff's whistleblowing regarding Krause's spending.  Frank Keeler told Jonathan Bush and Chris Getman that Plaintiff should have gone directly to Krause with the issues surrounding the spending of Defendant's funds – in other words, that Plaintiff should have concealed the problems from other of Defendant's Directors, as Krause was attempting to do.  Even at that time, Frank Keeler's statement made no sense because Plaintiff <u>had</u> discussed the problem of Krause's spending privately with Krause three times prior to that meeting.  When Krause refused to do anything about the problem, Plaintiff alerted the other Directors.

41.     After that meeting, Jonathan Bush and Chris Getman told Plaintiff what had been said.  It was apparent to Plaintiff that that Frank Keeler, the RIA consultant, was either being lied to by Krause, or was simply pushing Krause's agenda because Krause was paying him his fees.

42.     On March 7, 2016, during his routine email review for compliance purposes, Plaintiff found a draft of a promissory note on the Defendant's email server.  The draft was dated March 1, 2017 and appeared to have been prepared for Krause by Defendant's client and attorney (who also sometimes assisted Defendant), William Durkin.

43.     The promissory note was for a revolving loan of up to $100,000, to Defendant, at 10% interest, to be made against another one of Defendant's client's retirement account.  This was highly alarming to Plaintiff because, not only was it was unethical, but it was also clearly prohibited by NASAA Rule 102(a)(4)-1 (which prohibits an investment advisor from "borrowing money or securities from a client…."), and Connecticut Uniform Securities Act Regulation § 36b-31-15c ("the following shall be deemed 'dishonest or unethical practices in the securities … business…' by investment advisers…  (6) Borrowing money or securities from a client…").

44.     In addition, the loan, if carried out, would also have been a clear violation of Defendant's compliance procedures and manual, and could trigger a prosecution action from the SEC. Plaintiff brought the promissory note to the attention of Mary Milman and she informed Jonathan Bush.  Together, Plaintiff, Mary Milman, and Jonathan Bush were able to prevent Krause from following through with the improper loan.

45.     During that discussion, Krause told Plaintiff, Mary Milman, and Jonathan Bush that he was attempting to get the loan in order to make payroll, to pay off another $60,000 that he had charged to the Defendant credit cards, and because he now owed another $10,000 to his divorce attorney.

46.     On March 7, 2017, Plaintiff and the other Directors were informed by individuals from Beers Hammerman (the accountants that Plaintiff had demanded that Krause hire to review Defendant's books and accounting) that Krause has secretly fired the accounting firm two weeks

prior, which Krause did not reveal to any of Defendant's directors or employees.  In addition, Krause had forbidden Beers Hammerman from talking to any of Defendant's employees with any questions regarding Defendant's accounting practices.  On information and belief, Krause eventually agreed to re-hire Beers Hammerman after Director Jonathan Bush pleaded with him to do so.  However, at the time, Beers Hammerman was struggling to conduct an audit of Defendant's books because Defendant has not filed corporate taxes since 2013 and because Krause was refusing to cooperate,

47.    Individuals at Beers Hammerman further confirmed with Plaintiff and the other Directors that Defendant's bank accounts were effectively empty and that, in their opinion, there were "ongoing issues."  They advised Jonathan Bush and Chris Getman to hire Attorney Jim Segaloff in New Haven to analyze the issues and assist Defendant.

48.    On March 8, 2017, during his routine compliance auditing, Plaintiff found a highly suspicious email from the new employee Krause had hired to work on Defendant's accounting and books, Penney Detchon (a former colleague of Krause's) to Krause.  That email said, in part:

> I would like to hear more about your conversations with Chris and Mr. Bush. It can be difficult for me to speak on the phone here, because the walls have ears and a closed door only makes people paranoid.
>
> If I understood you correctly, you will be unwinding the employment agreement between Defendant and Alex ....
>
> I have to tell you that I feel somewhat apprehensive about working with you on accounting again, since this is what got between us in 2005. The books which I so carefully maintained started to disintegrate before I left, and from what I've heard they've been a mess ever since. You know me to be meticulous and straightarrow.  I know you to be perpetually low on cash, robbing Peter to pay Paul.  I will do my best not to be judgmental if you will be open with me and allow me to do what I'm good at. Can we make this work?

(emphasis added).

49.     On the Evening of March 8, 2017, Plaintiff called Jonathan Bush and asked him whether

he knew that Krause intended to fire Plaintiff.  Jonathan told Plaintiff that Frank Keeler, the RIA

consultant, had advised Krause to fire Plaintiff because Plaintiff had discovered Krause's

excessive spending and infractions of securities regulations, and notified other Directors about

the issues Defendant was facing.  Plaintiff reminded Jonathan that Plaintiff only brought the

issues to the Directors' attention after Plaintiff had pleaded with Krause privately on several

occasions to reduce his spending and behave ethically toward his clients.  In addition, Mary

Milman and Lynn Gamerdinger were aware that Plaintiff had attempted to speak to Krause about

the issues privately on multiple occasions.

50.     On March 15, 2017, the attorney Jim Segaloff, along with Chris Getman and Jonathan

Bush, created a demand letter for Krause. Then and now, Krause has 100% control of Defendant

(Krause is the sole owner and shareholder), but they were attempting to force him to cede some

control in an attempt to save the Defendant's business, control Krause's spending, and stop

Krause from committing any further violations of securities regulations.  The main goal of the

demand letter was to vastly improve Defendant's compliance procedures, including dividing

control of the Defendant among multiple Directors to avoid future ethical and regulatory

breaches on the part of Krause.

51.     The letter was delivered to Krause on March 18,2017, via email, and acknowledged as

received by Krause. It stated:

> Mr. Charles Krause
> March 15, 2017
>
> Dear Charlie:
>
> We are in receipt of your email of March 13, 2017. The acts you have
> committed constitute a gross violation of appropriate business behavior
> and probably would give rise to a criminal prosecution. On a personal

level, we are deeply grieved by your action and have sustained significant monetary damages as you will note upon reviewing relevant documents and agreements.

We have been talking with our attorney Jim Segaloff and our accountant David Migani [of Beers Hammerman]. In order to move forward, the following need to be addressed:

1.  Your attorney and Jim Segaloff must communicate and prepare an agreement with such terms and conditions that will be acceptable to us.

2.  Beers Hammerman, with whom you have previously spoken, will be the accounting firm for the Company.

3.  You are to provide a written report setting forth all monies that you have diverted from the Company and your plans for repayment.

4.  Control of the Company: Chris Getman, Jonathan Bush and you will be the sole directors of the Company and have the authority to manage the Company; a two-thirds vote shall control.

5.  Mary Milman shall assume the role of financial officer and be responsible for all financial reports. She shall report directly to the three directors.

6.  Payroll: Jonathan Bush is prepared to discuss loaning funds to the Company to meet the payroll. However, the terms of the loan including security for the loan, will need to be agreed upon. Said loan to be repaid upon receipt by the Company of first quarter fees.

7.  Legal fees incurred by Jonathan Brush or Chris Getman shall be reimbursed by the Company.

8.  Your compensation, plus reasonable expenses, shall be determined by the Directors.

The above is not intended to be all inclusive, is made without prejudice and is not intended to waive any of our rights.

Jonathan Bush
Chris Getman

52.    On March 16, 2017, Chris Getman had an in-depth discussion with Krause about the

financial issues.  On March 17, 2017, Chris Getman sent the following letter to Jonathan Bush:

14

Hi John,

Interesting conference call. I don't think that Krause understands the severity of his transgressions, but think it's time to move on. It's my guess that his threat to "walk" was a bluff, but still am sympathetic to the stress that he's under which has been complicated by his father's recent diagnosis.

It's my belief that we need to address his concerns sooner rather than later, which is when you'll be back in New Haven. He's really stressed, and if we nonchalantly suggest that "it can wait" I think we'd be sending him the wrong message if we want to keep the company intact. Krause needs to understand that in order for him to regain the trust of both of us, as well as those in the office, he needs to submit to the conditions we imposed in our letter. It's my feeling that he is bluffing about separating our two companies. He would be left with nothing; no employees, no one willing to work with him etc. It would be a complete disaster for him, and I think he realizes that. There's not a whole lot of powder in his chamber.

At the same time, I think that you and I need to focus on the importance of resolving this. Last week, when we were on vacation, it seemed imperative for me to drive three hours, twice, for a three hour meeting, as well as spend more time in Vero Beach.  Since then, things have escalated, and I think it's really important that we keep focused on the issues. That's why I was disappointed that we didn't have the scheduled conference call this morning, and your schedule, going to a lecture etc. didn't permit us to speak today until there was a pressure on time because you needed to go out for dinner. I'm also surprised that the letter from Jim was edited without my knowledge and sent out over my signature.

In my view, we have a great opportunity. Krause, you and I, I think, make a good team and once we get by these problems-and I agree that Krause needs to agree to our terms-we'll have a great opportunity going forward, but I don't think this can wait until you're here in more than a week.  His mindset is too fragile...

53.    Since March 2017, Krause continues to spend excessively and he is putting the Defendant

and the clients at enormous risk.  Krause was relying on the outside consultant he hired, Frank

Keeler, to insulate him about his inappropriate spending, but, on information and belief, Frank

Keeler fired Krause as a client in May 2017 and refuses to work with him further, presumably

because it was apparent to Frank Keeler that Krause was determined to destroy Defendant to fuel his out of control spending and was likely continue to commit regulatory violations.

54.     Krause is trying to conceal the dire financial straits that he has placed Defendant in. For example, Krause asked Penney Detchon – his former colleague who he hired to assist with accounting and bookkeeping at Defendant – to retrieve and delete her email records. Krause further asked Penney Detchon to only communicate with him using his non-Defendant controlled Gmail account.

55.     Likewise, Penney is actively assisting Krause with his cover up. On April 27, 2017 Penney emailed Krause the following (emphasis added):

> What is it that you don't want your partners or Mary [Milman] to see? The stockholder loan? The balance sheet liabilities? What are you being accused of? I did tell Mary that when we pay your Visa and Amex, I classify the payments as stockholder loans, then distribute the business portion to the P&L. She asked me if I thought the amounts that were expensed to [Defendant] seemed legitimate, and I said that as far as I could tell they were, though you were still working on them. She murmured something about you paying back the stockholder loan, so I've probably said too much already but I really don't know how to assure her that my numbers are legitimate if I can't show where they come from…

56.     Attempting to conceal email is a blatant violation of Rule 204-2 of the Investment Advisors Act of 1940, 17 C.F.R. § 275.204-2 and Connecticut Uniform Securities Act Regulation Section 36b-31-14b. Krause is aware of this. In addition, demanding that Defendant employees delete or otherwise destroy information related to Defendant's investment advisory services is also likely a violation of Rule 21F-17 of the Securities Exchange Act of 1934. *See* 17 C.F.R. § 240.21F-17 ("No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation…").

57.     The severely restricted availability of funds has created other issues for Defendant.  On numerous occasions, Defendant has failed to timely pay employees.  Earnings Statements received by employees reflect a payment date that is within seven days following the prior pay period, however, Defendant often does not initiate the actual payment for several days beyond that date.

58.     Defendant has also frequently misused employee deferred 401(k) funds.  Defendant's employees' wages are withheld from their pay pursuant to each employee's requested 401(k) contribution amount, but Defendant (via Krause) regularly fails to deposit the withheld wages into the employee's 401(k) plans well beyond the seven day safe harbor provision – at times funds were not deposited into employee 401(k) accounts for months.

59.     On August 15, 2017, David C. Migana, Co-Managing Partner of Beers Hammerman, wrote to Jonathan Bush and Chris Getman to notify them that, effective August 16, 2017, Beers Hammerman was terminating FBC as a client due to (Charles, a/k/a Charlie) Krause's refusal to cooperate with the accountants, at the urging of Beers Hammerman's malpractice attorney:

> Chris & Jonathan,
>
> I spoke to Chris earlier today to tell him we have a conference call with our malpractice attorney.
>
> They absolutely insist that, since we have given Charlie several deadlines to provide the information we need, and he has failed to do so, that we have no choice but to resign from the job now.
>
> John Ermer will be sending a letter to that effect out to Charlie tomorrow.
>
> Chris mentioned a new deadline of Sept 15, which none of us believe. However, to continue to delay our threatened withdrawal only opens us up in the future, if such an unfortunate circumstance were to develop with Charlie.

17

Sorry, but we have given Charlie more than a fair number of chances to provide us with the information we need, and he has failed to do so.

The missing information is substantial, and would have a material impact on the preparation of the financial statements, and accounting, we were engaged to do.

I wanted to give you a heads up today that the letter will go out tomorrow.

Thank you.

It's unfortunate that this has all happened, but I owe it to our firm to do what is right for the firm as a whole.

Regards,
David C. Migani, CPA

60.    On August 17, 2017, Beers Hammerman sent a letter to Charles Krause, notifying him that they were terminating their engagement with Defendant due to Defendant, through Krause, refusing to provide them with timely accounting information:

Dear Mr. Krause,

We regret to inform you that we must withdraw from our role as the accountants for Fairfield, Bush & Company, Inc. The reason for this withdrawal, which is effective immediately, is that we are not getting Company accounting and tax information that we need on a timely basis. Due to this problem, we are not able to effectively complete the services outlined in our attached engagement letter dated May 17, 2017.

As we pointed out to you previously, the beginning balances for 2016 in your Quick Books file may not be correct. We had requested a copy of your Company's 2015 corporate tax return to support those beginning balances, but we never received it. We do have a concern that the level of possible shareholder distributions and shareholder loans that we see in your Company's Quick Books file may at some point negatively affect the operations of Fairfield, Bush & Company, Inc. We recommend that you have your new accountant complete a full accounting for 2016 and up to the current date in 2017 as soon as

> possible to help you properly assess your Company's financial condition…

61.    After Plaintiff exercised his free speech to repeatedly notify Krause and other of the Defendant's Directors regarding the misappropriation of Defendant's funds and other illegal activity, Krause began retaliating against Plaintiff by, among other things, discussing his termination with his consultant, Frank Keeler, isolating him, reducing his workload, restricting his duties and access to certain of Defendant's computer systems which Plaintiff has always previously had access, and encouraging other employees not to work with Plaintiff, barring Plaintiff from Defendant's weekly investment committee meetings, and instructing Plaintiff not to answer the phone or use Defendant's computer network.

62.    Despite the retaliation and hostile treatment of Plaintiff, Plaintiff has continuously attempted to satisfactorily complete his job duties.  Plaintiff's protected speech did not have any impact on his ability to continue performing his job duties, or on the employment relationship generally.  Instead of responding appropriately to Plaintiff's complaints, Defendant – through owner Krause – elected to unlawfully retaliate against Plaintiff.

## V.    COUNT ONE: RETALIATION IN VIOLATION OF DODD-FRANK ACT §78u-6(h)

63.    Plaintiff hereby repeats and realleges paragraphs 1 to 62 as if fully plead herein.

64.     Krause's attempts to deduct fees from client accounts prior to the issuance of an invoice is a clear violation of Rule 206(4)-2 of the Investment Advisors Act of 1940, Krause's attempt to obtain a loan from one of Defendant's clients on behalf of Defendant is a violation of NASAA Rule 102(a)(4)-1, and Krause's encouraging employees of Defendant to delete email communications related to the business of Defendant is a violation of Rule 204-2 of the Investment Advisors Act of 1940.  Plaintiff's statements thus constitute protected speech as the

purpose of such statements was to identify activity which Krause, the owner and sole shareholder of Defendant, took or was attempting to take, which constitute federal and state securities law violations.

65.    Plaintiff made disclosures to his superiors regarding activity and actions which were in violation of federal and state securities laws and subject to the jurisdiction of the Securities and Exchange Commission.

66.    Plaintiff had a reasonable belief that Defendant was engaging in conduct that was in direct violation of one or more federal laws.

67.    Defendant had knowledge of Plaintiff's protected conduct and Defendant intentionally subjected Plaintiff to retaliation, including, but not limited to, verbally abusing Plaintiff, isolating him, barring him from meetings, ordering him not to use Defendant's email system, computer network, or phone, and openly discussing a desire to terminate him.

68.    As a result of Defendant's conduct toward Plaintiff, Plaintiff has suffered significant losses, including, but not limited to, emotional distress, embarrassment, mental anguish, humiliation, damage to his professional reputation, loss of promotional opportunities, loss of enjoyment of life, and loss of enjoyment of his profession.  In addition, Plaintiff has suffered specific damages in the form of reduced bonus payments from Defendant.

69.    In addition, as a further result of Defendant's retaliatory conduct, Plaintiff has incurred and will continue to incur attorney's fees and costs in pursuing this claim.

**VI.    COUNT TWO: RETALIATION PURSUANT TO CONNECTICUT GENERAL STATUTE § 31-51q**

70.    Plaintiff hereby repeats and realleges paragraphs 1 to 69 as if fully plead herein.

71.    Based on the foregoing, Defendant illegally retaliated against Plaintiff because he engaged in activity protected by Conn. Gen. Stat. § 31-51q.

72.     Plaintiff's complaints to Krause and other of Defendant's Directors and senior employees are protected speech inasmuch as it concerned violations of securities laws and breaches of Defendant's fiduciary obligations to clients.  Plaintiff's statements were made in response to Krause's intentional and official dishonesty and misappropriation of Defendant's funds to finance his excessive spending which was not related to Defendant's business, and which was influencing Defendant to take actions which violated state and federal securities laws.

73.     Plaintiff's protected speech did not in any way interfere with Plaintiff's job performance or his working relationship with his employer.  Plaintiff continued to perform his job duties before and after expressing his deep concerns to Krause and, indeed, hoped that his expressions to Krause would serve to remedy the situation vis-à-vis convincing Krause to cease his illegal and unethical behavior.

74.     Defendant had knowledge of Plaintiff's protected conduct and Defendant intentionally subjected Plaintiff to retaliation.

75.     There is a causal connection between Plaintiff's protected conduct and Defendants' retaliation against him.

76.     As a result of Defendant's conduct toward Plaintiff, Plaintiff has suffered significant losses, including, but not limited to, emotional distress, embarrassment, mental anguish, humiliation, damage to his reputation, loss of promotional opportunities, loss of enjoyment of life, and loss of enjoyment of his profession.  In addition, Plaintiff has suffered specific damages in the form of reduced bonus payments from Defendant.

77.     Defendants exhibited a reckless indifference to Plaintiff's rights, or an intentional and wanton violation of Plaintiff's rights, thereby entitle Plaintiff to an award of punitive damages.

78.     In addition, as a further result of Defendant's retaliatory conduct, Plaintiff has incurred and will continue to incur attorney's fees and costs in pursuing this claim.

## VII.    COUNT THREE: VIOLATION OF THE FAIR LABOR STANDARDS ACT ("FLSA") 29 U.S.C. § 201, *et seq.*

79.     Plaintiff hereby repeats and realleges paragraphs 1 to 78 as if fully plead herein.

80.     At all relevant times, Defendant was an employer within the meaning of 29 U.S.C. § 203(d).

81.     At all relevant times, Plaintiff was an employee within the meaning of 29 U.S.C. §203(e)(1).

82.     Defendant regularly failed to pay wages to its employees in a timely manner.  Earnings Statements provided to employees by ADP regularly reflected a "Pay Date" that was seven days or less following the conclusion of the previous pay period.  In reality, however, Defendant routinely initiated the actual payment of wages multiple days after the stated "Pay Date," causing hardship on employees and failing to pay them in a timely manner for time worked.

83.     Defendants' violations of FLSA were willful.  Defendant's violations of FLSA were neglectful of prevailing law and demonstrated disregard for the requirements of FLSA.

84.     As a result of these violations, Plaintiff suffered damages.

85.     Defendant is liable to Plaintiff for these violations of his rights under federal law.

86.     Plaintiff is entitled to an award of damages for unpaid wages, plus liquidated damages in an equal amount and interest for failure to pay timely wages, as well as attorneys' fees in an amount to be determined at trial.

## VIII.   COUNT FOUR: VIOLATION OF THE CONNECTICUT MINIMUM WAGE ACT ("CMWA"), CONN. GEN.STAT. § 31–58, *et seq*.

87.     Plaintiff hereby repeats and realleges paragraphs 1 to 86 as if fully plead herein.

88.    Plaintiff brings this claim under §§ 31-58 of Connecticut's Wage and Hour Law, Conn. Gen. Stat. § 31-58 et seq., against Defendant.

89.    At all relevant times, Defendant was an "employer" within the meaning of Conn. Gen. Stat. § 31-58(d).

90.    At all relevant times, Defendant employed Plaintiff within the meaning of Conn. Gen. Stat. § 31-58(g).

91.    At all relevant times, Plaintiff was an employee of Defendant within the meaning of §§ 31-58(e).

92.    Defendant, knowingly and in bad faith failed to timely pay wages due to Plaintiff for work performed in the State of Connecticut at the state minimum wage, in violation of Conn. Gen. Stat. §§ 31-58(i), 31-60(a).

93.    As a result, Plaintiff suffered damages.

94.    Defendant is liable to Plaintiff for these violations of his rights under state law.

95.    Plaintiff is entitled to an award of damages for unpaid wages plus liquidated damages in an equal amount and interest for failure to pay timely wages, as well as attorneys' fees in an amount to be determined at trial.

## IX.    COUNT FIVE: WAGE VIOLATION UNPAID WAGES PURSUANT TO CONN. GEN. STAT. § 31–71a, *et seq*.

96.    Plaintiff hereby repeats and realleges paragraphs 1 to 95 as if fully plead herein.

97.    Plaintiff brings this claim under §§ 31-72 of Connecticut's Wage and Hour Law, Conn. Gen. Stat. § 31-72 *et seq*. against the Defendant.

56.    At all relevant time periods, Defendant is an employer within the meaning of Conn. Gen. Stat. § 31-58(d).

57.    At all relevant time periods, Defendant employs Plaintiff within the meaning of Conn.

Gen. Stat. § 31-58(e).

98.    Defendant knowingly and in bad faith failed to pay Plaintiff wages on a timely basis.

99.    As a direct result of the Defendant's actions as alleged herein, Plaintiff has suffered and continues to suffer damages.

100.    Plaintiff is entitled to an award of damages for unpaid wages, plus liquidated damages in an equal amount, including double damages pursuant to Conn. Gen. Stat. § 31-72, plus interest and attorneys' fees in an amount to be determined at trial.

## X.    DEMAND FOR RELIEF

WHEREFORE, Plaintiff hereby requests the following relief:

A.    Award of compensatory damages, including but not limited to, lost wages, lost benefits, emotional distress, mental anguish, humiliation, embarrassment, loss of enjoyment of life, and loss of enjoyment of profession;

B.    Award Plaintiff liquidated damages in an equal amount as provided by FLSA, 29 U.S.C. §216(b), in an amount to be determined at trial;

C.    Award Plaintiff the full amount of unpaid wages, minimum wages, and overtime as provided by Conn. Gen. Stat. §§ 31-68(a) and 31-72, in an amount to be determine at trial;

D.    Award Plaintiff double damages in an equal amount and interest as provided by Conn. Gen. Stat. §§ 31-68(a), 31-72, in an amount to be determined at trial

E.    Award of compensatory and punitive damages;

F.    Award attorneys' Fees and Costs;

G.    Award pre-judgment interest;

H.    Award post-judgment interest;

I.    Award such other relief in law or equity as this Court deems appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

THE PLAINTIFF
Alexander Cooke

By: ___/s/_____
Mark P. Carey (ct17828)
Elizabeth W. Swedock (ct28907)
Law Offices of Mark P. Carey, P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel
(203) 255-0380 fax
mcarey@capclaw.com
eswedock@capclaw.com